UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

ROSEMARY MORGAN-LEE,              )
                                 )
              Plaintiff          )     CIVIL ACTION NO.
                                 )     13-11997-DPW
                                 )
       v.                        )
                                 )
THERAPY RESOURCES MANAGEMENT,    )
LLC                              )
                                 )
              Defendant.         )


MEMORANDUM
OF
FINDINGS OF FACT
AND
CONCLUSIONS OF LAW
REGARDING
JUDGMENT FOR DEFENDANT
WITH RESPECT TO
<u>RETALIATION CLAIMS</u>

November 13, 2023

TABLE OF CONTENTS

I.   OVERVIEW.................................................. 5

II.  PROCEDURAL OVERVIEW....................................... 7

III. FINDINGS OF FACT......................................... 9

     A. Background ........................................... 9

     B. Ms. Morgan-Lee's Role in 2011 ....................... 11

     C. Early Findings of Potential Fraud ................... 13

     D. Friction with Ms. Rajagopal ......................... 15

     E. Ms. Morgan-Lee's Difficulty with Coworkers and Ms.
        Rajagopal's Attempts to Reduce Tensions ............. 20

     F. Ms. Morgan-Lee's Response to De-Escalation Efforts ... 26

     G. Ms. Morgan-Lee's Work-Related Stress ................ 27

     H. The Meeting at Whittier ............................. 29

     I. The October 28 Meeting and Its Aftermath ............ 33

     J. Ms. Rajagopal's Further Efforts to Calm Tensions ..... 36

     K. Ms. Morgan-Lee Takes More Time Off, Is Asked to Return
        or Take Leave, and Invokes Whistleblower Protections . 37

     L. Ms. Morgan-Lee Contacts the Owners .................. 47

     M. Ms. Morgan-Lee Meets with Mr. Scott and Attorney
        Blackman and Declines to Identify Instances of Fraud . 50

     N. Ms. Morgan-Lee's Termination ........................ 53

IV.  CONCLUSIONS OF LAW....................................... 54

     A. FCA Retaliation ..................................... 54

        1. Protected Activity............................... 55

           a. Legal Standard ............................... 55

           b. Analysis ..................................... 57

        2. Employer Knowledge.............................. 60

           a. Legal Standard ............................... 60

           b. Analysis ..................................... 62

        3. Retaliatory Causation........................... 65

           a. Legal Standard ............................... 65

      b. Analysis ........................................ 66

    B. RIWPA Retaliation ................................... 74

V. JUDGMENT................................................. 76

This case poses the factual question of whether an employee, Rosemary Morgan-Lee, was fired in retaliation for internally raising her concerns of fraudulent activity within her employer, Therapy Resources Management (TRM).  If she was fired for reporting fraud, an activity protected under the False Claims Act (FCA), 31 U.S.C. § 3730(h), and the Rhode Island Whistleblowers' Protection Act (RIWPA), R.I. Gen. Laws §§ 28-50-1 to -9, TRM could be liable for damages.  TRM contends she was fired because of a breakdown in the employment relationship and is entitled to no damages.

An initial jury trial ended in a mistrial when one juror unaccountably refused to answer when she was polled after the verdict was recorded.  Thereafter, the parties tried the case again, this time as a bench trial.

For the reasons set forth below, as finder of fact, I conclude that Ms. Morgan-Lee has not proven by a preponderance of the evidence that she was fired because she engaged in protected activity.

Ms. Morgan-Lee, whose duties included auditing TRM's billing and documentation practices, was required to identify and report billing discrepancies.  She did, on several occasions, identify discrepancies indicative of potential misconduct or fraud that would fall within the whistleblower protections of the FCA.  I find, however, that she was

discharged because of a spate of unapproved absences and an outright refusal to provide specifics about purported fraudulent activity, even though that was her job.  The breakdown of Ms. Morgan-Lee's employment relationship was the culmination of an escalating pattern of erratic, confrontational, and frequently insubordinate communications by Ms. Morgan-Lee with superiors and colleagues, rather than the product of any retaliatory animus on the part of TRM.

Consequently, I will direct judgment entry for defendant TRM on Ms. Morgan-Lee's retaliation claims.

## I. OVERVIEW

Before she was fired in late 2011, Ms. Morgan-Lee was Director of Clinical Services for TRM.  Her duties in that role included auditing documentation such as billing records for services provided by TRM-employed therapists to patients in nursing homes that contracted with TRM.  Ms. Morgan-Lee's duties – and the pressures of her position – expanded significantly in the spring and summer of 2011, when the federal agency responsible for the Medicare program announced a substantial overhaul of Medicare billing requirements and procedures, to take effect in the fall of 2011.

In the course of her work, Ms. Morgan-Lee noted a variety of issues with TRM's operations and documentation, including some instances that she would claim were indicative of fraud.

She stridently raised the issues that she saw and took considerable umbrage when she felt that others in the organization were not following her recommendations.  At times, she seems to have viewed her role as including the authority to issue directives to TRM employees (as opposed to making recommendations to management), and in some instances she insisted that others within the company should be disciplined when they were insufficiently responsive to her recommendations.

By the fall of 2011, the tone of the interactions between Ms. Morgan-Lee and her colleagues and superiors had deteriorated, and working relationships were extremely strained. The company's president, Uma Rajagopal, sought to manage Ms. Morgan-Lee's frustrations and mediate her interactions with other employees.  Ms. Morgan-Lee perceived these efforts as further undermining her work and her authority.  In addition to Ms. Morgan-Lee's complaints about her colleagues, she began complaining of work-related stress.  These complaints became so frequent that Ms. Rajagopal expressed concern for Ms. Morgan-Lee's well-being and suggested changing her responsibilities.

In late October 2011, Ms. Morgan-Lee began unilaterally taking time off with little notice.  TRM, with the assistance of outside employment counsel, attempted to navigate Ms. Morgan-Lee's behavior and determine whether some type of leave would be appropriate.  In the first two weeks of November, Ms. Morgan-Lee

spoke and corresponded by email with TRM's Vice President of Human Resources and later with several of TRM's owners.  In large part, those communications related to her conflicts with Ms. Rajagopal and others, but Ms. Morgan-Lee also voiced claims of fraud or other wrongdoing at TRM.

TRM asked Ms. Morgan-Lee to provide further details about her claims, including at a meeting on November 14, 2011.  At that meeting, TRM's Vice President of Human Resources and TRM's outside counsel asked her for specifics about the misconduct that she claimed to have uncovered.  Ms. Morgan-Lee, however, refused to discuss the matter and suggested that she wanted to have an attorney of her own present.  Afterwards, she was unreceptive to requests to meet further and continued in her refusal to provide specifics of the purported misconduct.

TRM extended Ms. Morgan-Lee's paid leave through Thanksgiving, and, on November 29, 2011, informed her that she would be terminated as of December 2, 2011.

## II. PROCEDURAL OVERVIEW

This case began as an expansive *qui tam* action with numerous defendants.  The original defendants were TRM, Ms. Rajagopal, and three companies that operated nursing homes that used TRM's services: Whittier Health Network, LLC; Health Concepts, Ltd.; and Diocesan Facilities Self-Insurance Group,

Inc.  Also named were various individual facilities operated by
those companies.

Plaintiff's second amended complaint dropped Diocesan
Facilities Self-Insurance Group and its facilities as
defendants.  [*See* Dkt. No. 65].  Four months later, Plaintiff
dismissed her claims against Ms. Rajagopal and against Health
Concepts and its facilities (although the dismissal of those *qui
tam* claims was explicitly without prejudice as to the
government).  [*See* Dkt. 94 p. 2-3].  In the same filing,
Plaintiff dismissed some of her claims against Whittier Health
and all her claims against TRM except the FCA and RIWPA
whistleblower retaliation claims.  [*Id.*].  Those retaliation
claims are the subject of this decision.

Plaintiff's other claims against Whittier Health and its
facilities were settled in August of 2016.  [*See* Dkt. No. 163].
In September and October of 2016, the U.S. Attorney's Office for
the District of Massachusetts announced that Health Concepts and
Whittier Health (as well as one executive from each company) had
reached settlement agreements of $2.2 and $2.5 million,
respectively, to resolve allegations that the companies "failed
to take sufficient steps to prevent TRM from engaging in a
pattern and practice of fraudulently inflating the reported
amounts of therapy provided to Medicare Part A patients in [the
companies'] facilities" (as stated identically in two press

releases).  *See* Press Release, U.S. Att'y's Office, Dist. of Mass., *Nursing Home Operator and Director of Long Term Care to Pay $2.5 Million to Settle False Claims for Rehabilitation Therapy*, Justice.gov (Oct. 13, 2016), https://www.justice.gov/usao-ma/pr/nursing-home-operator-and-director-long-term-care-pay-25-million-settle-false-claims; Press Release, U.S. Att'y's Office, Dist. of Mass., *Rhode Island Nursing Home Operator and Chief Operating Officer to Pay $2.2 Million to Resolve False Claims Allegations*, Justice.gov (Sept. 28, 2016), https://www.justice.gov/usao-ma/pr/rhode-island-nursing-home-operator-and-chief-operating-officer-pay-22-million-resolve; *see also* Settlement Agreement, Dkt. No. 247-2.

The underlying FCA claims having settled without further challenge, the sole remaining question in this suit (apart from the award of expenses, attorneys' fees and costs) is whether TRM fired Ms. Morgan-Lee in retaliation for protected activity and thereby violated the whistleblower protections of the FCA, the RIWPA, or both.

### III. FINDINGS OF FACT

#### A.  *Background*

Plaintiff Rosemary Morgan-Lee is a licensed physical therapist.  In 2003, she was hired by TRM, a company that provided rehabilitation services – such as physical, occupational, and speech therapy – to nursing home patients.

She began as a Rehab Manager, overseeing TRM's services at one nursing facility, and she was eventually promoted to Director of Clinical Services, which was her position during the events that were the focus of the trial.

Ms. Morgan-Lee's job responsibilities as Director of Clinical Services included writing policies to support the TRM mission statement, educating and training the staff, and auditing medical records for inappropriate billing practices by therapists (which could range from poorly worded documentation to billing for services not rendered or changing doctors' orders).  [Dkt. No. 349 p. 45-47, 68-70; *see* Ex. 34A (documenting issues found by Ms. Morgan-Lee in a review of one patient's records)].

One of Ms. Morgan-Lee's central responsibilities was to monitor and support compliance with Medicare reimbursement standards.  Although TRM did not submit bills directly to Medicare, its owners and management understood that billing information provided by TRM would be provided to Medicare and also understood that TRM was responsible for ensuring its billing practices conformed to federal government standards.[1] [Dkt. No. 349 p. 26-28].

---

[1] TRM billed nursing facilities for services that TRM therapists and workers provided to residents at the facilities.  [Dkt. No. 349 p. 12].  The facilities, in turn, submitted reimbursement

**B.    Ms. Morgan-Lee's Role in 2011**

In 2011, the Centers for Medicare and Medicaid Services announced a series of changes to their reimbursement procedures, with an effective date of October 1, 2011.  *See* Proposed Rule, Medicare Program; Prospective Payment System and Consolidated Billing for Skilled Nursing Facilities, 76 Fed. Reg. 26364 (proposed May 6, 2011); Final Rule, Medicare Program; Prospective Payment System and Consolidated Billing for Skilled Nursing Facilities for FY 2012, 76 Fed. Reg. 48486 (Aug. 8, 2011) (codified at 42 C.F.R. pt. 413) (setting forth the final rule and stating an effective date of October 1, 2011).

In anticipation of the Medicare rule changes, Ms. Morgan-Lee and the rest of TRM's clinical team set out to educate TRM's employees about the new requirements.  To that end, Ms. Morgan-Lee and TRM's supervisory staff routinely held trainings for staff, sent out memoranda, and prepared presentations.  [Dkt. No. 349 p. 68-69].

At the same time, TRM's president, Ms. Rajagopal, directed Ms. Morgan-Lee and other members of the clinical team to audit treatment records to determine whether therapists were adjusting their billing practices as needed to comply with the upcoming

---

claims to Medicare.  [*See id.*].  Medicare reimbursed the facilities, which in turn paid TRM an agreed-upon fee or percentage of the Medicare reimbursement, as determined by the facilities' contracts with TRM.  [*Id.* p. 24-26].

changes.  [Dkt. No. 349 p. 69-70; Dkt. No. 342 p. 28-29].  These audits were designed to find billing issues, which Ms. Morgan-Lee documented in email "synopses" that she sent to the relevant managers at TRM and to Ms. Rajagopal.  [Dkt. No. 349 p. 60, 68-70].  Although Ms. Morgan-Lee made recommendations directly to regional managers and senior managers within TRM, implementation of her recommendations fell to TRM's operations team, which included the regional managers who oversaw the company's operations at each facility.  [Dkt. No. 342 p. 29-32, 40-42; Dkt. No. 349 p. 71].  Regional managers were responsible for working with Ms. Rajagopal to develop "Plans of Correction" to address issues raised by Ms. Morgan-Lee.  [Dkt. No. 342 p. 30-31].  The authority to decide what changes to make and how to make them rested with Ms. Rajagopal.  [*See* Dkt. No. 349 p. 71].

As is common for audit and compliance personnel in many organizations, Ms. Morgan-Lee's position required her to operate in a nuanced role.  She was empowered to request information from a broad range of employees and to report her findings to senior management, but she was not in a position to implement policy changes, to direct employees' work, or to impose discipline.  This division of responsibilities appears to have taxed Ms. Morgan-Lee's patience.  As discussed below, she was repeatedly frustrated by what she saw as a lack of responsiveness to her recommendations.

Although Ms. Morgan-Lee may have felt that her recommendations went unheeded, the facts set forth below do not demonstrate that TRM management schemed to silence her.  In the spring and summer of 2011, she reported findings suggestive of fraud, yet she suffered no adverse consequences, and the company supported her in many respects.  The fact that Ms. Morgan-Lee did not encounter any adverse employment actions when she began reporting potential fraud in the first three quarters of 2011 informs my finding that her firing in December of 2011 was not retaliation for reporting potential fraud.

## C.   *Early Findings of Potential Fraud*

At trial, Ms. Morgan-Lee testified that she had observed and reported potential fraud on various occasions, including at times well before the events that precipitated her firing.  One notable example involved a series of conversations on March 31 and April 1, 2011, more than six months prior to the events leading up to her firing.  In March of 2011, Ms. Morgan-Lee had noticed that a particular patient's file included physician's orders for therapy three times per week, yet Medicare was being billed at the highest reimbursement level – a level that was only available for patients receiving therapy at least five times per week.  [Dkt. No. 349 p. 49–53; Dkt. No. 463 p. 13–19].  Ms. Morgan-Lee testified that she met with an Assistant Regional Manager about the issue and that he told her he would shred the

existing physician's orders and replace them with orders calling for five treatments per week.[2]  [Dkt. No. 349 p. 50-51].  Ms. Morgan-Lee testified that she had refused to approve the altered chart for submission.  [*Id.* p. 52].  She further testified that she had a conversation with Ms. Rajagopal about the matter, from which she inferred that Ms. Rajagopal had ultimately approved the documentation with the altered physician's order.  [*Id.* p. 52-53].  Ms. Morgan-Lee's testimony was partially corroborated by a copy of a text that she received from Ms. Rajagopal, which read, "I am being very clear.  We cannot lose these adrs[3] so figure it out or refuse to do them. I will figure it out[.]" [Ex. 8; *see* Dkt. No. 349 p. 58-59, Dkt. No. 463 p. 16-17, 19].

This interaction and others like it show that Ms. Morgan-Lee was raising specific concerns suggestive of fraud to TRM's management and having direct, even confrontational, interactions about those concerns more than six months before anyone in TRM management took steps towards altering her employment status (*i.e.*, by preparing to consult the company's employment counsel about her).  [*See, e.g.*, Ex. 40 (showing internal correspondence dated November 2, 2011, initiating an effort to seek legal

---

[2] From Ms. Morgan-Lee's description, it appears that this would not change the number of therapy hours billed, but would affect the reimbursement rate.

[3] ADRs is an acronym that refers to requests for additional documentation, which the Medicare program required before paying a claim.

advice regarding Ms. Morgan-Lee's extended absences)].  That Ms. Morgan-Lee's explicit and specific reports of misconduct in the spring of 2011 did not trigger adverse employment consequences undercuts her contention that her discharge in December of that year was actually in retaliation for whistleblowing about problematic billing practices.

### D.    *Friction with Ms. Rajagopal*

The pressure of preparing for impending changes to Medicare's rules for billing practices increased tensions between Ms. Morgan-Lee and her colleagues, and generated tensions with her supervisor, Ms. Rajagopal, as well.  Such tensions are evident in the tone of various email exchanges between Ms. Morgan-Lee and Ms. Rajagopal and in the synopses that Ms. Morgan-Lee wrote describing the results of her audits.

I do not exclude at this stage of my evidentiary analysis that some of the tensions between Ms. Morgan-Lee and Ms. Rajagopal derived from the substance of Ms. Morgan-Lee's reports (that is, the accusation that TRM and its leadership were failing to prevent, or were even condoning, improper billing).  For the most part, however, the conflicts that emerged in the fall of 2011 appear to have stemmed from the combined effects of Ms. Morgan-Lee's view of her role, her pertinacious insistence that perceived issues be addressed immediately and on her terms,

15

and significant interpersonal communication challenges between the individuals involved.

The evidence shows that Ms. Rajagopal, on multiple occasions, supported and undertook to implement Ms. Morgan-Lee's recommendations.  Exhibits and testimony reflect that Ms. Rajagopal emphasized the importance of properly transitioning to the new billing process and pressured TRM employees to bring their operating procedures into line.  For example, Ms. Rajagopal sent an email on or around September 26, 2011, to a group that included Ms. Morgan-Lee, as well as various rehabilitation managers, regional managers, clinical consultants, and TRM's director of operations.  [Dkt. No. 342 p. 33].  With the effective date for the new Medicare procedures approaching, Ms. Rajagopal's email projected a sense of urgency and threatened discipline for employees who failed to comply with required changes to billing and reporting practices:

        Guys

        We cannot deliver 800 min of therapy for uh pts/we
        cannot still use grps the same way/ we cannot choose
        ard dates as before/ we have to re vamp our
        operational approach

        If rcs cannot do this then they will be written up
        Unfortunately our timeline for transition is passing
        w/o any effort from your teams to change operational
        habits

        Thx
        Uma Rajagopal

16

[Ex. 13].[4]  There is no evidence to suggest that Ms. Rajagopal's email was a pretext or sham and, on its face, it reflects an effort to enforce compliance with the new Medicare billing requirements in advance of the new rule's implementation.

Ms. Morgan-Lee's outsized view of her own role – and her lack of tact – is evident in her response to Ms. Rajagopal's email.  Ms. Morgan-Lee sent a reply to thirteen recipients, while omitting Ms. Rajagopal.  In her email, Ms. Morgan-Lee set a deadline for regional managers to prepare plans of correction in response to her synopses and demanded that each plan be signed by the regional manager and the manager responsible for the TRM's operations at the specific facility.  She wrote:

> All regionals need to bring their Plan of Corrections for each of the synopsis that you have received by Friday am, Sept 30th.
>
> Again, it is not rationales as to why things are the way they are, but how the RM are correcting the issues being found both operationally and clinically under CMS regulations, State practice acts and TRM policies and procedures.

---

[4] I present the correspondence between the parties as is, without correcting typographical and grammatical errors or altering spacing.  The terminology is somewhat opaque, owing in part to the use of specialized acronyms (*e.g.*, "uh" for ultra-high therapy rates and "adr" for additional documentation request).  Technical jargon aside, there is much that is cryptic in some of these emails.  In some instances, the language reflects the writers' personalities and relationships.  Equally important, the lack of clarity (in part due to poor sentence construction) helps to explain some of the confusion between the parties.

They need to be signed by the regional and rehab
manager

[*Id.*].

A few days after this email, Ms. Morgan-Lee met with Ms.
Rajagopal and complained that a colleague had been told
(presumably by Ms. Rajagopal) that he needed only to submit a
plan of correction to Ms. Rajagopal, not to Ms. Morgan-Lee.
[Dkt. No. 342 p. 35].  On September 30, the day before the new
billing procedures became effective, Ms. Morgan-Lee sent an
email which again reflects that she saw herself as not only an
auditor, but as someone empowered to implement and enforce
policies.  Writing to Ms. Rajagopal, Ms. Morgan-Lee complained
that certain regional managers were not responding to her
directions.  In part, her email stated:

> I get responses [from these managers] like "we are
> not doing that, we were told we dont have to , we
> didnt go over the synopsis, Uma asked me to give
> those to her instead of you, and/or we weren't taught
> that way," which do not seem appropriate when I ask
> you and you ask me to ask them why.

> Thus, if they are not following through, then it
> would be very apparent that the RC/staff may not be
> getting the information either

> As I spend numerous hours working diligently to get
> things done timely, thoroughlty, accurately,
> objectively, ethically and completely, it would be
> most appreciated for them to follow through as others
> are expected to do as well.

> Im very concerned about many clinicall and
> operational practices as you are as stated.

> I request for this to not be shared with anyone, but
> enforced.....much appreciated

[Ex. 56].[5]  In response, Ms. Rajagopal wrote only, "Are you

trying to say something?" to which Ms. Morgan-Lee replied, "Im

asking you...the below?"  Ms. Rajagopal responded, "I don't like

the way u say 'undo' what u do", apparently in reference to a

conversation outside the email chain in which Ms. Morgan-Lee had

complained that Ms. Rajagopal was "undoing" her work.  [Ex. 56;

Dkt. No. 342 p. 35-36].  These kinds of email interactions are

characteristic of the correspondence between Ms. Morgan-Lee and

Ms. Rajagopal, and they reflect the increasingly fraught

relationship between two frustrated parties.

There is nothing to suggest, however, that the tensions

between Ms. Morgan-Lee and Ms. Rajagopal indicated a desire or

intention on Ms. Rajagopal's part to retaliate against Ms.

Morgan-Lee.  Rather, there is considerable evidence of Ms.

Rajagopal's solicitude towards Ms. Morgan-Lee, her concern for

Ms. Morgan-Lee's emotional well-being, and her repeated efforts

to ameliorate tensions between Ms. Morgan-Lee and others at TRM,

including Ms. Rajagopal herself.  These facts, as set forth

---

[5] The parties often use ellipses as elements of their
punctuation.  To distinguish original punctuation from
omissions, where I have referenced quoted text, my alterations –
including ellipses used to indicate omissions – are in brackets.

below, undercut any suggestion that Ms. Rajagopal was looking for a pretext to discharge Ms. Morgan-Lee.

**E.   *Ms. Morgan-Lee's Difficulty with Coworkers and Ms. Rajagopal's Attempts to Reduce Tensions***

Notwithstanding her own challenges in communicating with Ms. Morgan-Lee, Ms. Rajagopal attempted to mediate Ms. Morgan-Lee's difficulties with her colleagues.  One example is Ms. Morgan-Lee's interactions with Jerry St. Jacques, a Regional Manager.

In October of 2011, Ms. Morgan-Lee suspected that some billing records in Mr. St. Jacques' region were being altered to add minutes of therapy to bills that came up short.  [Dkt. No. 349 p. 54-55].  Due to the complexity of the Medicare reimbursement rules and review process, it is difficult to ascertain the extent and seriousness of the issues that Ms. Morgan-Lee identified in Mr. St. Jacques' region.  I credit Ms. Morgan-Lee's testimony that there were some instances, at least, when TRM employees manipulated therapy hours in order to qualify for higher reimbursement rates.  It is not clear, however, whether these ultimately impacted reimbursements.  [*See id.* p. 56 (noting that a reimbursement claim "came back denied at the higher level")].

Having heard Ms. Morgan-Lee testify, I find that she fervently believed that the problems were serious and that Mr.

St. Jacques' efforts to correct them were inadequate.  It is equally evident, though, from the parties' contemporaneous emails, that Ms. Morgan-Lee's tone in pressing her concerns was impolitic, at best, and frequently self-aggrandizing.[6]  More significantly, her comments show her to be oblivious to the distinction between her own role as an auditor/compliance advisor and the roles of executives with direct responsibility for operations.  Even assuming that many of Ms. Morgan-Lee's findings and recommendations were correct, it is unsurprising that her employer would conclude that her hectoring tone and her disregard for organizational boundaries exacerbated tensions within the company.  Her emails with and about Mr. St. Jacques are indicative of *both* the nature of her concerns *and* the reasons why her employer might have taken issue with how she communicated her concerns.

Ms. Morgan-Lee's exchange with Mr. St. Jacques in mid-October of 2011 captures some of the tenor of these communications.  By email, she noted that some therapists were working with patients outside of the 7 a.m. to 7 p.m. workday established by company policy and noted that some therapists

---

[6] In many of her emails, Ms. Morgan-Lee touts own efforts.  For example, on Saturday, October 1, 2011, in response to Ms. Rajagopal telling her that some team members work harder than others, Ms. Morgan-Lee wrote, "All I will speak for is myself....I give 100% every minute/second I work....go where and when is needed and always offer[.]"  [Ex. 58].

were failing to meet company quotas for productivity.  These

matters of company policy (with no evident connection to

Medicare billing issues) were raised alongside observations that

some therapists appeared to be overstating therapy times and

that therapists sometimes billed for meetings related to patient

care ("PPS meetings") at which patients were not present.  [*See*

Exs. 15, 33].  On October 17, 2011, Ms. Morgan-Lee sent an email

to Mr. St. Jacques regarding one of the facilities in his

purview.  She wrote:

> I never received any feedback re; major concerns
>
> Deb, OTR, still in building very late at night, one
> patient missed Rx 'due to fatigue' Sat pm (she was there
> till 1030pm)...as well as others in before 7am and out
> after 7pm, but she has been spoken to in the past as
> well.... [. . .]
>
> WV, Im very concerned about billing being added when it
> is founded that a category is missed, Friday it appeared
> all billing was in Sat/Sun when I was auditing?
>
> [. . .]
>
> Med As cannot be billed for PPS meetings if patient not
> present or at any time if patient is not actively
> participating in Rx.
>
> [. . .]
>
> Will send more thorough audits but Im sure if youvve
> viewed you have found similar patterns unchanged or
> minimal change
>
> Thanks

[Ex. 33].  Mr. St. Jacques responded that he "did speak to [the

named facility] and was again told it was a mishap on billing

(therapist did a 15 minute non-planned treatment)" and that he "[r]e-educated about use of community re-integration and only billing for meetings if resident is present."  [*Id.*].  He concluded by noting that Ms. Morgan-Lee was reviewing past bills, and he commented that practices had improved: "I understand you are looking back at the ADR timelines... but West Shore, Morgan, and all there rest ARE delivering what is being billed now."  [*Id.*].

Earlier that same day, Ms. Morgan-Lee had emailed Ms. Rajagopal about billing, stating, based on conversations with other employees, that there was a pattern of employees adding 5 to 15 minutes to a patient's bill if the patient was "short." [Ex. 32].  The record does not show any direct response from Ms. Rajagopal.  However, the next evening, Ms. Rajagopal sent Ms. Morgan-Lee and thirteen others an email with the subject line "Please take a step back."  The email read:

> I understand that there are concerns and discontent. I am confident that no one on my corporate team and no one on my mgmt team is intentionally trying to undermine TRM.
>
> I am seeing emails back and forth. All I want to say is that we need to respect each other in our roles and be supportive of audits done.
>
> Guys there is no need to teach each other rules and ethics. Clinical is sharing it's findings and ops needs to work on following through.
>
> Why is there so much friction?

No need to beat up on same issues and no need to get
into defensive/ offensive modes.

The cms environment is already beyond all our control.
Do we need to continue these battles? Can't we try to
learn from each other and also try to take a more
partnership approach with each other?

No one is trying to change codes/ criticize / target
individuals/ make errors or do fraud.....

Just let's please try to improve our strengths and stop
our errors.

Thx

[Ex. 14].

This email does not seem to have mitigated the friction
between Ms. Morgan-Lee and her coworkers.  Ms. Morgan-Lee
remained frustrated with Mr. St. Jacques' responses to her audit
reports.  After Ms. Morgan-Lee sent him a multiple-page email
itemizing her concerns by facility and by individual employee,
Mr. St. Jacques replied, in part, "Rosemary, This is another
audit with a large amount of information.  Again I just ask that
I be given some time to catch up on things and focus on the
points I am able... [. . .] I have given much verbal education
and counseling."  [Ex. 15].  Ms. Morgan-Lee responded, copying
Ms. Rajagopal,

I did give you more than adequate time besides we should
not even find most of these issues
and they are individual/home....I just put in one email,
you can break it down

I am doing as asked and completing all as requested which
takes me a significant amt of time

Uma asked if I called you as well, which I have numerous
times to reeducate and educate as well you have been
presenting the info for the last 1-2 years, thus these
should not be as significant, consistent and prevalent

I had given you an extra week for reaudit, these are
ongoing and I find it interesting that groups went
completely away in a flash so I know that the RCs should
take care of issues.

I knew you didn't have presentations or anything so you
also had plenty of time

Word of advice, I would change the issues myself, as I
did as a regional since they are consistent and unchanged
by some

[Ex. 15].

Ms. Morgan-Lee's follow-up correspondence with Ms.

Rajagopal in the next days reinforces the impression that Ms.

Morgan-Lee's indignation toward team managers had overwhelmed

her sense of collegiality and professional decorum.  She emailed

Ms. Rajagopal again two days later regarding her concerns about

Mr. St. Jacques' region, noting that minutes would sometimes be

added to bills under suspicious circumstances.  [Ex. 16].  She

followed up that night with another email to Ms. Rajagopal,

writing,

I had not heard back from you re: my growing concerns in
this region esp with questionable billing
practices/minutes added and noncompliance with
practices/education in [Mr. St. Jacques'] region

Ive done everything to educate, speak to him as well as
you.

Advise

[*Id.*].  Ms. Morgan-Lee sent Ms. Rajagopal yet another email the next morning reiterating that "there is little to no change in some regions/home after extensive education, audits with synopsis, black and white feedback/phone consults, whatever and whenever necessary."  [Ex. 17].  She continued, writing that the situation "has created a significant amount of work related stress with me, at times challenging my ethics [. . .]."  [*Id.*].

In responsive emails, Ms. Rajagopal attempted to address Ms. Morgan-Lee's frustrations.  Ms. Rajagopal suggested a degree of empathy for the managers whom Ms. Morgan-Lee was criticizing, and she reminded Ms. Morgan-Lee that her job was to audit, whereas the authority to implement changes sat with the operations team.  Replying to Ms. Morgan-Lee's email, Ms. Rajagopal wrote, "There are multiple managers at different levels of our organization who have similar ethics and values. They are all working to improve operations every day."  [*Id.*]. In a separate email around the same time, Ms. Rajagopal reminded Ms. Morgan-Lee that "[her] job is to do audits and educate" and asked her to "pl let the operational managers decide how to take it to the next level."  [Ex. 18].

**F.   *Ms. Morgan-Lee's Response to De-Escalation Efforts***

The emails reported in the preceding section (III.E.) seemed to have marked a breaking point for Ms. Morgan-Lee, who treated Ms. Rajagopal's responses as a personal affront.  Ms.

Morgan-Lee replied on October 27, 2011, that Ms. Rajagopal's response put a "huge obstacle" in the way of her ability to perform her job well, and that "[a] great divide was just put in our teamwork by this statement, in my opinion." [*Id.*].

In trial testimony several years later, Ms. Morgan-Lee characterized her feelings at the time and described a situation that she viewed as one in which TRM employees ignored her findings in September and October with Ms. Rajagopal's backing:

> And I was very frustrated. I was very upset. I was very -- I had a lot of emotions. I felt for a long time I had been supported by [Ms. Rajagopal]. However, remarks were passed by other Rehab Managers and Regional Managers that they informed me that [. . .] [Ms. Rajagopal] instructed them not to listen to me, and that they were to listen to her. I was disappointed. I probably felt every emotion, because I'm very passionate about what I do.

[Dkt. No. 349 p. 68]. She further testified that she "felt betrayed" when she was told that Ms. Rajagopal had instructed other employees to follow instructions from Ms. Rajagopal over those from Ms. Morgan-Lee. [*Id.* p. 69]. Her testimony suggests that she saw Ms. Rajagopal's assertion of authority as a sign of personal antipathy rather than as an exercise of managerial responsibility and authority. [*Id.* ("I thought we had a decent relationship, [. . .] and I felt betrayed, actually[.]")].

## G.   *Ms. Morgan-Lee's Work-Related Stress*

In various of the late-October emails from Ms. Morgan-Lee to Ms. Rajagopal, Ms. Morgan-Lee complained that her

professional responsibilities were causing her great stress.
[*See, e.g.*, Ex. 17 ("It has created a significant amount of work
related stress with me, at times challenging my ethics[.]"); Ex.
18 ("I am very concerned with the stress related to my job to
allow me to perform and follow through as well as disrespect and
at times unhealthy responses with personal attacks.")].  In
response to one email, Ms. Rajagopal wrote, "I don't want you to
feel undue stress[.]  So pl let me know if doing your job
differently or having different responsibilities would help[.]"
[Ex. 38].  Responding to another email, she wrote:

> There are operational issues we deal with as we work
> with people
>
> I am not sure why u feel staff is not held
> accountable
>
> Everyone is trying to do their best for the most part
>
> You can always talk to Gus and VP of human resources
> he will bring his report to me.
>
> Thx.

[Ex. 36].  Ms. Rajagopal's emails suggest that she saw Ms.
Morgan-Lee's comments as indicative of an emerging personnel
issue, and she forwarded several email exchanges with Ms.
Morgan-Lee to Robert "Gus" Scott, TRM's Vice President of Human
Resources.  [*See* Exs. 36, 37, 38].

There is no evidence that Ms. Morgan-Lee responded to Ms.
Rajagopal's suggestion that they consider changes to her

responsibilities or other stress-reduction strategies.  Ms.
Morgan-Lee did, however, continue to complain about her work-
related stress in emails.  [*See, e.g.*, Exs. 19, 20, 25].

**H.   *The Meeting at Whittier***

On October 27, 2011, Ms. Morgan-Lee attended a meeting at
the offices of Whittier, an operator of nursing homes and a
major TRM customer.  [Dkt. No. 349 p. 69, 72].  That morning,
Ms. Rajagopal had sent the email reminding Ms. Morgan-Lee that
"[her] job is to do audits and educate[.]"  [Ex. 18].  One of
the meetings that day, between Ms. Morgan-Lee and a Whittier
employee, concerned how Whittier planned to document a
particular claim when submitting it to Medicare.  [Dkt. No. 342
p. 52-55].  Ms. Morgan-Lee knew that the ultimate submission of
the claim was done by Whittier, and that TRM could not control
how Whittier chose to submit the claim.  [Dkt. No. 342 p. 55].
She was also aware that an outside healthcare consulting company
was assisting Whittier and had made recommendations about how
Whittier should submit such claims.  [Dkt. No. 342 p. 59-60].

Although Ms. Morgan-Lee did not know precisely how the
claim was being handled, she was certain that Whittier's
approach was fraudulent and left the meeting abruptly and
angrily:

> I had a brief meeting.  We sat down, and she, [the
> Whittier employee], said, "So, we're going to go ahead
> and add the one unit and the one penny to the bill,"

> they call it a "UB-04," and I said, "I already instructed
> Uma [Rajagopal] that I don't know what that means, but
> we shouldn't be doing that, that's fraud," and I was
> sickened, mad, got up and left.

[Dkt. No. 349 p. 72].  Ms. Morgan-Lee testified that she was

upset because she felt that Ms. Rajagopal had endorsed her

recommendations in private but had not adequately supported her

in communications with Whittier prior to the meeting (Ms.

Rajagopal was not present for the meeting itself).  [Dkt. No.

342 p. 60-61].

Ms. Morgan-Lee's testimony conveyed the impression that she

left Whittier's offices abruptly.  [Dkt. No. 349 p. 72-73].  Ms.

Rajagopal called Ms. Morgan-Lee after Ms. Morgan-Lee left, and

they had a contentious phone call.  [*Id.*].  Ms. Morgan-Lee

testified that the phone call was the first time that she ever

used the word "fraud" to describe any of her concerns.  [Dkt.

No. 463 p. 49-50].  The conversation was apparently quite

heated, and Ms. Morgan-Lee testified about the incident that "my

emotions were everywhere."  [Dkt. No. 349 p. 73].  Ms. Rajagopal

apparently hung up on her.  [*Id.*].

Ms. Morgan-Lee then called Mr. Scott, TRM's Vice President

of Human Resources, and told him that, because of her tensions

with Ms. Rajagopal and her work-related stress, she would need

to take a day off.  [*Id.* p. 74].  Ms. Rajagopal attempted to

call Ms. Morgan-Lee repeatedly during the rest of the day, and

Ms. Morgan-Lee finally called her back that evening, at which time Ms. Rajagopal informed her that she was scheduling a mandatory meeting the following day to address Ms. Morgan-Lee's concerns.  [*Id.*].  Ms. Rajagopal also sent an email to Ms. Morgan-Lee about the meeting, which Ms. Morgan-Lee responded to around 10 p.m.:

> As noted in all my synopsis , there are clinical and operational as well as TRM policy/procedure, CMS and STate practice act concerns
>
> How you have responded has been unhealthy for me and created work related stress especially after your verbal responses on the phone today in regards to my concerns with billing/practices.
>
> As you have been informed, I also do not appreciated being portrayed as the 'bad guy,' for many years to other coworkers/corporate and professionals just as [the Whittier employee] had stated on several occassions today..it just became too much today
>
> I have done everything and anything asked to the best of my ability but felt today and from this mornings' email that it is difficult for me.

[Ex. 19].  Later that night, Ms. Rajagopal responded to another somewhat scattered email from Ms. Morgan-Lee, addressing each concern in turn and writing the following in closing:

> Rosemary, I think I have tried as much as I can to hear you out.  If you are really that unhappy, please let's sit down and talk about you transitioning your role. Your well being is most important. You have had multiple family issues and I am sure work adds more stress. So we can meet to talk. But I really need to give you the ability to reduce your stress by helping you take on a different role. Maybe one facility based or one state based.

[Ex. 20].  No evidence was presented that Ms. Morgan-Lee responded to this email, although she forwarded it to Mr. Scott around 11:20 p.m., calling it "a typical response over the last 7 years in which the issues are deflected and manipulated[.]" [*Id.*].

Ms. Morgan-Lee sent Mr. Scott another email a few minutes after midnight:

> Gus,
> I never heard back from you
>
> I sent you several texts
>
> Uma contacted me an excessive amt of time...at least 7 texts, 2-3 emails and 3-5 calls...I finally spoke to her as she strongly requested I be at the meeting tomorrow...I did inform her I would try as she stated she would be addressing numerous concerns
>
> However, she stated any time off is not approved if I dont file a written complaint or comp issue nor MLOA, is this accurate if I inform her and you of what I informed both of you?
> This is not to be shared with anyone
>
> Thanks

[Ex. 22].  This email showed Ms. Morgan-Lee to be conspicuously unenthusiastic about attending a meeting on issues that she had been persistently emailing Ms. Rajagopal about for weeks.[7]

---

[7] Although Ms. Morgan-Lee characterized Ms. Rajagopal's attempted communications as "excessive," it does not appear that the attempts were out of keeping with the ordinary conventions of communication at TRM, at least as Ms. Morgan-Lee herself practiced them.  Ms. Morgan-Lee was certainly a sender of more than one late-night flurry of emails.  Her complaint about the

Whoever may have shared responsibility for the escalation of tensions up to this point, Ms. Morgan-Lee's behavior in the last week of October had clearly begun testing the outer boundaries of acceptable professional behavior.

*I.*    **The October 28 Meeting and Its Aftermath**

Ms. Morgan-Lee did attend the meeting the next day, along with Ms. Rajagopal, Mr. Scott, and about 17 other members of the staff, accounting for the entire clinical team and the entire operations team.  [Dkt. No. 350 p. 16].

At trial, the parties presented diametrically opposed accounts of the meeting's events.  Ms. Morgan-Lee testified that the meeting was extremely volatile:

> What happened was it was not a meeting for me to discuss
> my concerns.  It was a meeting driven by Uma ranting,
> screaming, crying, threatening.  It was a very volatile,
> hostile meeting, going around the room attacking certain
> people personally and also stating if anybody in the
> room had the F-ing balls to report fraud, that she would
> ensure that not only would they not have a job with TRM,
> that she would make sure they didn't have one in the
> industry.  And then she also continued to make
> disparaging comments about the owners and some of our -
> - some of TRM's big customers.  And at the end of this
> awful meeting she stated that if anybody wanted to
> resign, that she would accept their resignation with
> three months' severance and/or if anybody wanted to take
> time off, that she would approve the time and then to go
> seek Robert Scott for a second signature.

---

frequency of contact might have been sincere, but it rings
hollow in context.  It does not persuade me that Ms. Rajagopal's
outreach was beyond the pale; rather it reflects the
interpersonal brittleness between Ms. Morgan-Lee and Ms.
Rajagopal at this time.

[Dkt. No. 349 p. 75-76].

TRM presented Mr. Scott's testimony, which described a very different scene.  He was at the meeting on October 28 and testified that Ms. Rajagopal did not say anything along the lines of "if anyone has the fucking balls" or "[i]f you report fraud, then you will never work in the industry."  [Dkt. No. 350 p. 17].  Nor did Mr. Scott receive any complaints about the meeting from anyone other than Ms. Morgan-Lee.[8]  [Dkt. No. 350 p. 18].

I note that Ms. Morgan-Lee spoke to Mr. Scott later that day and indicated that she needed to discuss "work 'issues'" with him.  [*See* Ex. 42].  She declined, however, to elaborate and instead asked to speak with Brian Pontolilo, one of TRM's owners.  [*See id.*].  To the extent that Ms. Morgan-Lee spoke about problems with billing, it is undisputed that she did not

---

[8] Contemporaneous emails from Ms. Morgan-Lee indicate that, from the start, the parties had vastly different perceptions or recollections of the meeting.  [*See* Ex. 20 (email from Ms. Morgan-Lee to Mr. Scott, dated Oct. 30, 2011) ("I am not sure if you are aware of the level of staff splitting that occurs at the 'President' level which appears to have created the hostile work environment.  Based on the fact that you remained in the meeting on Friday and allowed the verbiage to be utilized, I would say that you may not have been aware."); Ex. 27 (email from Ms. Morgan-Lee to Ms. Rajagopal, copying Mr. Scott, dated Nov. 9, 2011) ("I did inform you that you gave the impression in the meeting on October 28, 2011, that operations didn't have to follow clinical recommendations, you disagreed that is what you said and you felt you supported clinical findings and recommendations[.]")].

mention fraud to Mr. Scott at this time.  [*See* Dkt. No. 350 p. 18 (Mr. Scott's testimony that, as of his receipt of an October 30, 2011, email from Ms. Morgan-Lee, she had never said anything to him about fraudulent billing practices); Dkt. No. 349 p. 76 (Ms. Morgan-Lee's testimony acknowledging that she did not use the term "fraud" with Mr. Scott on October 28)].

To the extent that the dispute about what happened at that meeting on October 28 is material to the decision in this case, I conclude that Ms. Morgan-Lee's perception of this meeting does not accurately reflect the tenor or content of the meeting, and I credit Mr. Scott's testimony.  Ms. Morgan-Lee's acknowledgement that she did even mention the word "fraud" in speaking with Mr. Scott afterwards is difficult to square with her description of the meeting as an expletive-laced tirade threatening retaliation against anyone who reported fraud at TRM.  Further, had the meeting really included such explicit and profane threats, it seems likely that Ms. Morgan-Lee would have found at least one corroborating witness among the 20-odd people in attendance.

In any event, that night, Friday, October 28, at 11:19 p.m., Ms. Morgan-Lee emailed 28 people, including Mr. Scott and Ms. Rajagopal, writing only, "I will be off until at least Nov 2, 2011[.] Thanks[.]"  [Ex. 21].  She emailed Ms. Rajagopal and Mr. Scott on the early morning of Wednesday, November 2 to say

that she needed to take "a couple more days off from TRM at this time." [Exs. 39, 40].

Less than 10 minutes later, Mr. Scott emailed Ms. Rajagopal to ask how she would like to handle Ms. Morgan-Lee's continued absences. He wrote, in part:

> I'm not sure which direction you would like to head
> with this.  Rosemary is now officially taking more
> than three days in a row off for personal mental
> health reasons.  I can check and I would like to
> verify if we should ask for a Dr's note for her
> return or not.  Right now, she is in the driver's
> seat; telling us if and when she will return.  We
> could also simply tell her to take the rest of the
> week off and set a meeting to discuss her return.

[Ex. 40].  Mr. Scott closed by suggesting that Ms. Rajagopal should consult with an outside advisor about how to proceed, and she replied that she would call TRM's labor and employment counsel, Brian Lewis, the following day.  [*Id.*].

## J.   *Ms. Rajagopal's Further Efforts to Calm Tensions*

While the company grappled with a response to Ms. Morgan-Lee's absences, Ms. Rajagopal continued to try to engage with Ms. Morgan-Lee in an effort to facilitate her return to work. Ms. Morgan-Lee worked on November 4 [*See* Ex. 29], and she had lunch with Ms. Rajagopal at the Providence Place Mall, after which Ms. Rajagopal bought her a shirt from Talbots as a gift. [Ex. 27; Dkt. No. 342 p. 70-71].  Ms. Morgan-Lee testified that the lunch meeting was calm, relatively pleasant, and potentially an attempt to clear the air.  [Dkt. No. 342 p. 70-71].  In an

36

email she sent to Ms. Rajagopal the following week to summarize the meeting, Ms. Morgan-Lee wrote that "the meeting was ok and you seemed supportive of my concerns and professional goals going forward."  [Ex. 27].

Ms. Morgan-Lee's contemporaneous description of her perception of the meeting reinforces my view that the meeting was a genuine effort to reduce tensions, reset interpersonal relations, and find a path forward for Ms. Morgan-Lee.  The fact that Ms. Rajagopal was — even in the face of Ms. Morgan-Lee's unprofessional behavior — still attempting to find a way to accommodate and retain Ms. Morgan-Lee undercuts the suggestion that TRM's managers were bent on retaliating against Ms. Morgan-Lee for protected activity or were otherwise looking for an excuse to fire her.

**K.   *Ms. Morgan-Lee Takes More Time Off, Is Asked to Return or Take Leave, and Invokes Whistleblower Protections***

On the night of Sunday, November 6, Ms. Morgan-Lee announced via email that she would be taking November 7 off.[9] [Ex. 59].  Ms. Rajagopal replied, "Everything ok ?"  [*Id.*]. There was no evidence to indicate whether Ms. Morgan-Lee replied.  At noon on November 8, Ms. Morgan-Lee emailed Mr.

---

[9] It is possible that she sent this email in the early morning hours of Monday, November 7.  [*See* Ex. 24].

Scott telling him that she would not be working that day, either.  [Ex. 25].

After these further unexcused absences, Ms. Rajagopal and Mr. Scott contacted Attorney Lewis, TRM's employment counsel, who drafted an email to Ms. Morgan-Lee for Mr. Scott to send. [*See* Ex. 69J].  Attorney Lewis characterized the email as responding to "the situation over the past week or two" and summarized that it set forth three options for Ms. Morgan-Lee: (1) to return to work and "stop[] taking personal days with no notice," (2) to arrange for a formal leave and possible job restructuring "if she has a medical issue related to her stress," or (3) to speak with Mr. Scott or another individual if she needs help resolving an issue with a supervisor or coworker. [*Id.*].

In addition to the email to Ms. Morgan-Lee, the parties offered evidence of the internal correspondence that led up to that email.  None of this internal correspondence suggests that Ms. Morgan-Lee was being targeted for raising concerns about fraud.  Attorney Lewis's comments reflect a shared understanding that he was called in to address a newly arisen issue with attendance.  There is nothing to suggest that Ms. Rajagopal or

Mr. Scott had pointed to any issue of longer standing.[10]  Rather, the email appears to reflect a *bona fide* effort to give Ms. Morgan-Lee avenues to return to work, either immediately or after resolving whatever issue was causing her unexcused absences.  Although it is likely that the approach taken by TRM management was informed by Ms. Morgan-Lee's personality and her sometimes erratic behavior, the email made no direct mention of her significant friction with other TRM employees.  Instead, the focus was on the need to have Ms. Morgan-Lee reliably available to perform her duties as Clinical Director.  [*See* Ex. 42].

No doubt other employers would act summarily to fire an employee who, with little notice or explanation, took more than a week off from work, leaving others to pick up the pieces.  By contrast, TRM's attempts to accommodate Ms. Morgan-Lee, notwithstanding her failure to formally request an accommodation, suggest that the company was more interested in retaining her as a productive employee in some capacity than in firing her.

Mr. Scott sent the email drafted by Attorney Lewis to Ms. Morgan-Lee on the afternoon of November 8.  [Ex. 69J].  The

---

[10] Ms. Morgan-Lee's criticisms about other employees and their compliance with applicable rules had been going on for months. Whatever frustrations her managers may have felt about the tone or content of her complaints, the evidence does not suggest that those frustrations motivated the decision to bring in an employment lawyer.

email outlined the time off that Ms. Morgan-Lee had been taking, told her she could not take personal days off with so little notice, and offered several options for dealing with her stress — including options to take leave under the Family and Medical Leave Act (FMLA) or to restructure her job.  [Ex. 42].  The email promised that "any job restructuring will not impact your salary or other benefits [. . .] but, hopefully, will alleviate some of the stress that you are suffering[.]"  [*Id.*].

In response to Mr. Scott's email, Ms. Morgan-Lee sent Mr. Scott three emails in the middle of the night: 2:17 a.m., 2:32 a.m., and 2:40 a.m. on November 9.  [Exs. 42, 43, 44].  The first of these emails, though scattered, reads as a frustrated defense of her time off and other behaviors mentioned in Mr. Scott's email.  [Ex. 42].  For the first time, however, Ms. Morgan-Lee also suggests that she was facing retaliation as a whistleblower.  She closed the email by stating:

> I also believe you are aware that I shared some information with you on Friday, November 4,2011 as far as internal whistle blower protection act and the repercussions I have felt from my supervisor.  Trust in the HR department is a major concern as I also informed you.
>
> I did request via email and text today with Uma that we meet.  I received no response.
> Thanks

[*Id.*].

In her second email, Ms. Morgan-Lee again referred to whistleblower protections and used other employment-law jargon from the retaliation law context.  [*See* Ex. 43].  She wrote that she was "concerned about the repercussions that I have experienced while performing my job to the best of my ability as well as the hostile work environment as well as other factors from my supervisor, which has let to work related stress[.]" [*Id.*].  She then raised, again, her concern that some staff were working outside of the 7 a.m. to 7 p.m. hours set by TRM's internal policies.[11]  [*Id.*].

Ms. Morgan-Lee went on in her second email to claim more explicitly some kind of whistleblower protection, writing:

> It was my understanding that by informing my supervisor as well as regionals of my findings and concerns that I should have been protected by a 'whistleblowers protection law,' but it does not appear that way as the following seems to be occurring or could be implied, which is why I informed you on Friday, November 4, 2011.
>
> Some of the apparent repercussions may include: Threats made of failure to hire or rehire as well as other employees Intimidation Making threats re: position and future employment Reassignment affecting prospects for promotion and professional goals outlined over a year ago Implied Firing or laying off  (offer 3 months

---

[11] Whatever the purpose of this company policy on the start/finish of the workday, the mere fact that employees may have been working before or after their scheduled shifts is not indicative of fraud.  Whistleblower protections extend broadly to reports of fraud or misconduct with respect to government programs, but there is no special protection for employees who merely report violations of company rules.

> to employees on 10/28/11) [. . .] Potential demoting via
> email and verbally Potention of denying promotion

[Ex. 43].  This was followed by a third email, in which Ms.

Morgan-Lee complained that she had never been given a TRM email

address.  [*See* Ex. 44].

Mr. Scott responded to these emails that afternoon

(November 9), presumably after speaking with Attorney Lewis.

[*See* Exs. 26, 45].  In his email, Mr. Scott reiterated to Ms.

Morgan-Lee that she could not take personal days with little or

no notice and provided her with options for taking extended time

off.  [Ex. 26].  He also addressed her claims of "harassment,"

writing that the company needed her cooperation to investigate

her claims.  To that end, he requested a meeting:

> Additionally, in your emails to me, you have raised a
> number of issues about "harassment" and other things
> that you believe are "issues" at TRM.  TRM takes all of
> these allegations seriously, but in order to address
> them, I need to investigate them with you.  As such, we
> need to set down a time when you and I can meet, face to
> face, to discuss these allegations in more detail.  I am
> available to meet with you on Wednesday the 16th.  If
> you are still uncomfortable speaking with me, we can set
> up a meeting with Karli.

[*Id.*].

It is not clear from the evidence whether Ms. Morgan-Lee

responded immediately to Mr. Scott's email, but she did send a

lengthy email to Ms. Rajagopal that afternoon, with a copy to

Mr. Scott, summarizing the meeting between Ms. Morgan-Lee and

Ms. Rajagopal at the Providence Place Mall on the preceding

42

Friday (November 4). [*See* Ex. 27].  As noted above, she closed by writing that "the meeting was ok and you seemed supportive of my concerns and professional goals going forward.  and yes, thank you for lunch, your time and the shirt again."  [*Id.*].

The following day, November 10, Ms. Morgan-Lee responded to Mr. Scott, rehashing much of what she had previously written, although she did not offer a time to meet.  She wrote, in part:

> I absolutely informed you on the phone on Friday November 4, 2011 that my concerns were along the lines of 'retaliation of internal whistle blowing' and I informed you that I felt being unfairly treated due to me informing [Ms. Rajagopal] of certain findings.  There were a few other issues discussed on this date, but I did not extensively divulge as I informed you I needed more time. [. . .]
>
> I also spent much time with you on October 28, 2011 in regards to harassing, disparaging, threatening, abusivem manipulative and hostile work environment with [Ms. Rajagopal].

[Ex. 28].

Later that evening, seemingly in response, albeit in a separate email chain, Mr. Scott again attempted to schedule a meeting with Ms. Morgan-Lee, writing, in part:

> As for the meeting regarding your concerns and allegations, I would like to schedule it for Monday [November 14, 2011].  Please notify me what time works for you and I will make it available.  We take these concerns very seriously and seeing as how you seem to wish to get back to work, it is now time to address these concerns.

[Ex. 29].

A further email from Ms. Morgan-Lee on the next day
(Friday, November 11) did not address the request to meet, so
Mr. Scott wrote back that afternoon:

> Rosemary,
> I am asking again that you meet with me on Monday the
> 14th.  This is a mandatory meeting.  You have repeatedly
> raised serious concerns and made some allegations and
> they need to be documented in order that we proceed in
> any way.  [. . .]
>
> Please let me know today what time you expect to be in
> the office on Monday to go over your concerns.

[Ex. 46].

Ms. Morgan-Lee responded to the November 11 email with a
time to meet, and Mr. Scott confirmed the meeting.  [Ex. 47].
In that exchange, Ms. Morgan-Lee asked for Ms. Rajagopal to be
present at the meeting.  [*Id.*].  Mr. Scott responded that Ms.
Rajagopal would not be present because the meeting was intended
to address concerns about which Ms. Morgan-Lee had approached
him (presumably including Ms. Morgan-Lee's perception that she
was being mistreated by Ms. Rajagopal).  [*Id.*].

The contemporaneous email traffic is difficult to square
with Ms. Morgan-Lee's trial testimony, in which she contended
that she had contacted TRM's owners (as discussed below) because
she "wanted them to look into the fraud and the abuse and what
was going on, which may be inclusive of Uma Rajagopal."  [See
Dkt. No. 342 p. 90].  If, as she testified, Ms. Morgan-Lee's
intention was to expose Ms. Rajagopal as someone who was

44

complicit in fraud, it is difficult to understand why Ms. Morgan-Lee requested Ms. Rajagopal's attendance at the November 14 the meeting.

Conceivably, Ms. Morgan-Lee may have hoped that, in a meeting with Ms. Rajagopal and Mr. Scott, she might air her complaints about Ms. Rajagopal's management, and that Ms. Rajagopal would change her approach.  It seems more likely, however, that Ms. Morgan-Lee simply hoped to follow up on the conciliatory tone of her November 4 meeting with Ms. Rajagopal. This would be consistent with Ms. Morgan-Lee's email acknowledging Ms. Rajagopal's supportiveness at the November 4 meeting.  [See Ex. 27].  Either way, Ms. Morgan-Lee's request to include Ms. Rajagopal signaled to TRM that Ms. Morgan-Lee's focus – at that time – was to address her working relationship with Ms. Rajagopal, not to report Ms. Rajagopal for committing or condoning fraud.

A few minutes after the email exchange to arrange the meeting, Ms. Morgan-Lee emailed Mr. Scott again, this time voicing her concerns about organizational changes and shifts in job titles and responsibilities that Mr. Scott had just announced in a separate email to TRM staff.  [Ex. 30].  Ms. Morgan-Lee expressed concerns that another employee's new role overlapped too much with her own responsibilities and complained about a "lack of acknowledgement that I have also requested many

professional roles and levels of growth over the last 2-3 years
[. . .] .”  [*Id.*].  She then reiterated her claim that she was
being retaliated against and harassed, giving as an example of
“harassment” that Ms. Rajagopal had continued to try to contact
her after Ms. Morgan-Lee abruptly left the meeting at Whittier
on October 27.  [*Id.*].

It is notable that Ms. Morgan-Lee saw “harassment” in a
supervisor’s attempts to follow up with her after she abruptly
left a meeting with a major client.  I also note that Ms.
Morgan-Lee’s description of “harassment” was coupled with her
evident concern that colleagues whom she saw as unworthy were
being promoted while she was not.  Against this backdrop, I find
it is more likely than not that Ms. Morgan-Lee’s emotional needs
and professional frustrations colored her perception of her
dealings with Ms. Rajagopal and others.

Ms. Morgan-Lee’s apparently skewed perception of the
interactions in her workplace does not mean that her claims of
fraud were necessarily inaccurate.  The evidence is insufficient
to make a finding on that score, and Ms. Morgan-Lee was not, in
any event, required to prove actual fraud at trial.  The
particular incidents that Ms. Morgan-Lee describes may have been
isolated events or they may have been exemplars of pervasive
misconduct.  Either way, she seems to have perceived harassment

in various communications and interactions where less nefarious explanations are more probable.

There is no perfect vantage point that would allow a finder of fact, years later, conclusively to ascribe responsibility for the various failures of tact, diplomacy, and communication that contributed to the deterioration of Ms. Morgan-Lee's working relationship with Ms. Rajagopal and others at TRM.  But there is a dearth of credible evidence to suggest that the interactions between Ms. Morgan-Lee and Ms. Rajagopal – however fraught they might have been – reflected an intention by Ms. Rajagopal or other managers at TRM to harass or punish Ms. Morgan-Lee for reporting fraud.

## L.   *Ms. Morgan-Lee Contacts the Owners*

During the weekend before the planned meeting with Mr. Scott, Ms. Morgan-Lee emailed Brian Pontolilo, one of TRM's owners, to offer to share her "concerns for [the] company[.]" [Ex. 10].  They spoke by phone for over 40 minutes in what Mr. Pontolilo characterized as a "long, rambling conversation" in which Ms. Morgan-Lee expressed "a lot of concerns about things that were going on within the company and with some of the other managers and complained a lot about the president of the company [Ms. Rajagopal]."  [Dkt. No. 349 p. 31].  Despite the call's length, Ms. Morgan-Lee did not offer any specifics about purported fraudulent activity.  [Dkt. No. 349 p. 44].  Mr.

Pontolilo told Ms. Morgan-Lee that he was concerned by what she said; however, because he was no longer involved in TRM's operations, he suggested that she call another of the owners. [Dkt. No. 349 p. 35-36].

Following the conversation, Mr. Pontolilo emailed Armand Bergeron and Ron Diurba, the other two owners, to ask for "a comprehensive review by ownership of TRM's billing and documentation practices."  [Ex. 53].  He also suggested that the owners should interview management employees "regarding work environment allegations" and stated his concern "about reports from within and outside of the company that indicate disparaging remarks being made about clients and TRM owners."  [*Id.*].  The nature and breadth of the review requested by Mr. Pontolilo indicates that he understood Ms. Morgan-Lee to have raised serious concerns about TRM's billing practices.[12]

Mr. Pontolilo's email to the other owners of TRM made no reference to any claims of fraud on the part of Ms. Morgan-Lee. In his testimony at trial, he did not recall whether she had made any mention of fraudulent billing practices during their

---

[12] In response to Mr. Pontolilo's email, Mr. Diurba wrote that a comprehensive review was already underway, and noted that Mr. Scott and Charles Blackman, another attorney for TRM, were planning to meet with Ms. Morgan-Lee that morning.  [Ex. 53]. Mr. Pontolilo testified that an investigation was, in fact, conducted and that it did not find anything improper. [Dkt. No. 349 p. 40].

phone call.  [Ex. 53; Dkt. No. 349 p. 38].  It stands to reason that, had Ms. Morgan-Lee clearly and explicitly claimed fraud in that call, it would have been memorable to Mr. Pontolilo, whom I found credible.  In light of all the evidence, I find that Ms. Morgan-Lee either did not claim fraud in her call with Mr. Pontolilo or did so in a manner so unfocused as to be unrecognizable as such.  In the welter of Ms. Morgan-Lee's grievances, allegations of fraud may have been included, but I credit Mr. Pontolilo's testimony that such allegations were not readily identified as such.

After speaking to Mr. Pontolilo, Ms. Morgan-Lee also telephoned Mr. Diurba that weekend, although their conversation was short because he was driving.  [Dkt. No. 342 p. 85].  He suggested that she should email Mr. Scott to "streamline" what she wished to speak about in her meeting with Mr. Scott on the upcoming Monday, November 14.  [*Id.* p. 4].

On Sunday evening, November 13, Ms. Morgan-Lee sent an email to Mr. Diurba and Mr. Scott, which included "an outline of what I would like to discuss[.]" [Ex. 9].  Although that email included a line item for "Fraud and abuse concerns[,]" this was plainly identified as part of a recitation of headings from TRM's policy and procedure manual.  Beneath those headings, Ms. Morgan-Lee listed various areas of concern, including several that – at least arguably – could constitute fraud or abuse

49

within the ambit of the FCA: "Possible inappropriate billing practices[,]" "Moving therapists around who may be billing inappropriately[,]" and "Altered documentation during ADR processes/audits[.]" [*Id.*]. The email also asserted that she was "concerned with the negative consequences, possible retaliation due to internal type whistle blowing while performing [her] expected professional responsibilities[.]" [*Id.*].

**M.    *Ms. Morgan-Lee Meets with Mr. Scott and Attorney Blackman and Declines to Identify Instances of Fraud***

Shortly before the meeting between Ms. Morgan-Lee and Mr. Scott on Monday, November 14, management at TRM decided to invite Attorney Blackman to the meeting. [Dkt. No. 350 p. 69-70]. Ms. Morgan-Lee testified at trial that, upon her arrival, she was "blindsided and shocked" that there was an attorney present, and she initially indicated that she wanted to reschedule. [Dkt. No. 342 p. 6-10, 94]. The meeting eventually went forward and lasted around two hours. [Dkt. No. 350 p. 40]. At the meeting, Ms. Morgan-Lee declined to discuss her purported concerns about fraud. [*Id.*]. Instead, Mr. Scott testified, she focused on "work-related stress, sick leave, attendance issues, her concerns about a hostile work environment, and Ms. Rajagopal, in particular." [*Id.*].

During the meeting, both Mr. Scott and Attorney Blackman repeatedly requested that Ms. Morgan-Lee provide details about her claims of fraud to enable an investigation by TRM, but she refused, stating that she was "uncomfortable" with the meeting. [Dkt. No. 342 p. 11-12; Dkt. No. 350 p. 38].  Instead, Ms. Morgan-Lee testified, she directed Mr. Scott and Attorney Blackman to ask Ms. Rajagopal.  [Dkt. No. 342 p. 11-12].  At the end of the meeting, Mr. Scott instructed Ms. Morgan-Lee to take the remainder of the week off, with pay.  [*Id.* p. 65-66].

On Sunday, November 20, Ms. Morgan-Lee sent a long and disorganized email to Mr. Scott and TRM's owners.  [*See* Ex. 11]. In that email she (*inter alia*) rehashed her perception that TRM's management was hostile to her, complained that she did not have access to the TRM time entry system, expressed frustration about unclear expectations and what she saw as double standards, complained about the promotion of employees whom she saw as less capable than herself, and complained that she did not have a TRM email address.  [*See id.*].

In the same email, Ms. Morgan-Lee suggested sweeping audits of various corporate records to address what she called "HR/ hourly labor/payroll issues[.]"  [*Id.*].  She noted that some salaried employees routinely entered their daily time (8 hours) before the close of business.  [*See id.*].  On this basis she wrote, "I suggest and recommend that all 8 years of salaried

employees timesheet be audited," along with an 8-year audit of the timesheets of all hourly employees, "by outside independent auditors[.]"  [*Id.*].

Closer to the subject of possible fraud, Ms. Morgan-Lee offered an oblique comment, writing "As you are aware, I have the information to be shared re: my other concerns with billing/documentation etc., in the appropriate forum with the appropriate objective personnel who support all parties involved."  [*Id.*].  She did not make any more direct reference to fraud or indicate that the "billing/documentation" issues in question were outside the ordinary scope of her oversight duties.  [*Id.*].  She did, however, recommend that the company retain outside consultants to investigate the company's practices on site at "at least 25" nursing homes through unannounced visits, albeit without specifying any particular facilities that warranted such scrutiny.  [*Id.*].

Mr. Scott responded to Ms. Morgan-Lee's email, writing that the company would continue her paid leave because she and he had been unable to discuss her allegations, and requesting that she schedule another meeting with him and Attorney Blackman.  [Ex. 49].  She responded, declining to schedule a meeting until she had her own attorney.  [*Id.*].

### N.    Ms. Morgan-Lee's Termination

Two days later, on November 22, Mr. Scott sent Ms. Morgan-Lee a letter telling her that it was time for her to "transition" to the "next phase" of her career.  [Ex. 12]. After summarizing the events of the preceding weeks, Mr. Scott addressed Morgan-Lee's November 20 email:

> Despite your allegations in your email about suffering from "harassment" and "retaliation," it is clear that you are still complaining about TRM's work environment and the difficulties you have working with [Ms. Rajagopal], as well as the Directors, in performing your job duties.  You again make vague allegations to unlawful "billing practices," but you again fail to support these allegations.  It is troubling because in your position in TRM for the past eight years, you have been responsible for reviewing the billing and challenging denials [of payment by Medicare].  If there were problems in the billing practices that amounted to "fraud," it was incumbent on you to review and rectify those problems.

[*Id.*].  Mr. Scott also specifically responded to the request for an outside audit that Ms. Morgan-Lee had made in her November 20 email:

> You make this broad, unnecessary and unsupported request despite the fact that (1) you have failed to identify any specific acts of wrongdoing or improper billing, and (2) you have been the Director of Clinical Services for eight years and you are fully aware of the billing practices of TRM.  Without providing any support, it again simply appears that you are "stirring the pot" in an attempt to undermine [Ms. Rajagopal]'s ability to operate TRM.

[*Id.*].  The letter reiterated that TRM remained interested in investigating any specific claim of wrongdoing, repeated that

Mr. Scott and Attorney Blackman wished to meet with Ms. Morgan-Lee, and noted that the company could not investigate without her cooperation.  [*Id.*].

In the final paragraphs of the letter, Mr. Scott noted Ms. Morgan-Lee's stress, her difficulty working with others at TRM, her refusal to take FMLA leave, and her issues with taking days off with little notice.  [*Id.*].  He concluded, "Given these facts, it is apparent that the best way to resolve these issues is to work with you to transition you to the next phase of your career."  [*Id.*].  The letter closed by extending Ms. Morgan-Lee's paid leave beyond Thanksgiving to allow discussion of the matter after the holiday.  [*Id.*].

On November 29, 2011, TRM's employment counsel, Attorney Lewis, sent a letter to Ms. Morgan-Lee stating that TRM was terminating her employment effective December 2, 2011, and offering her a severance package.  [Ex. 31].  She declined that offer.  [Ex. 70].

### IV. CONCLUSIONS OF LAW

#### A.   *FCA Retaliation*

To prevail on her FCA retaliation claim, Ms. Morgan-Lee must prove by a preponderance of the evidence (1) that her conduct was protected under the FCA; (2) that TRM knew about her protected conduct; and (3) that TRM "discharged or discriminated against [her] because of [her] protected conduct."  *Guilfoile* v.

*Shields*, 913 F.3d 178, 187–88 (1st Cir. 2019) (quoting *U.S. ex rel. Karvelas* v. *Melrose-Wakefield Hosp.*, 360 F.3d 220, 235 (1st Cir. 2004) (abrogation on other grounds recognized by *U.S. ex rel. Gagne v. City of Worcester*, 565 F.3d 40, 42 (1st Cir. 2009))).  There is no requirement that Ms. Morgan-Lee prove a violation of the false claims provisions of the FCA.  *Id.* at 188.

     1.   <u>Protected Activity</u>

        *a.  Legal Standard*

Protected activity "is limited to activities that 'reasonably could lead' to an FCA action; in other words, investigations, inquiries, testimonies or other activities that concern the employer's knowing submission of false or fraudulent claims for payment to the government."  *Karvelas*, 360 F.3d at 237 (quoting *U.S. ex rel. Yesudian v. Howard Univ.*, 153 F.3d 731, 740 (D.C. Cir. 1998)).  By contrast, complaints about mere regulatory failings or violations of company policy cannot provide a predicate for a retaliation claim under the FCA.  *Cf. id.* ("Although '[c]orrecting regulatory problems may be a laudable goal,' it is 'not actionable under the FCA in the absence of actual fraudulent conduct.'" (alteration in original)

(quoting *U.S. ex rel. Hopper* v. *Anton*, 91 F.3d 1261, 1269 (9th Cir. 1996))).[13]

In cases where reporting fraud was part of a plaintiff's regular job duties, the plaintiff's actions must go beyond merely doing her job to be considered protected activity. *Bennett v. Abiomed, Inc.*, No. 13-CV-12277-IT, 2020 WL 1429847, at *6 (D. Mass. Mar. 24, 2020) ("[W]here an employee's job duties include overseeing government billings or payments, protected conduct does not include the scope of conduct that fall[s] within the employee's regular duties."); *see Karvelas*, 360 F.3d at 239 n.26 ("Some courts have held that employees who investigate government billings or payments as part of their job duties must 'make it clear that the employee's actions go beyond the assigned task' in order to demonstrate that they were engaged in protected conduct and their employers were on notice of that conduct." (quoting *Eberhardt v. Integrated Design & Const., Inc.*, 167 F.3d 861, 868 (4th Cir. 1999))).

_____

[13] Although the First Circuit has embraced the distinction between potential FCA claims and mere regulatory concerns, it has also noted that a plaintiff claiming retaliation is not required to prove "actual fraudulent conduct." *See Karvelas,* 360 F.3d at 238 n.23 ("A retaliation claim under 31 U.S.C. § 3730(h) does not require a showing of fraud [. . .] .").

> ### b.   Analysis

I find that Ms. Morgan-Lee has established by a preponderance of the evidence that she engaged in protected activity.  The question is clouded somewhat by the fact that her communications indiscriminately conflated matters that may be subject to whistleblower protection with matters that plainly are not.

Ms. Morgan-Lee's communications about her findings feature a varied and shifting array of recommendations about regulatory problems unrelated to potential fraudulent billing.  Moreover, for much of the period in question, her major focus was implementation of new billing procedures in anticipation of upcoming Medicare rule changes; that the new rules had not yet taken effect undercuts any suggestion that slowness in adapting to the announced change was tantamount to fraud.

Even further afield are Ms. Morgan-Lee's repeated, and sometimes strident, reports about instances when therapists provided services before 7 a.m. or after 7 p.m., and her reports about the way salaried employees completed their timesheets. These may have been violations of TRM policy, but they do not seem to have anything to do with false or fraudulent Medicare reimbursements.  There was little developed evidence about the

source or purpose of TRM's 7-a.m.-to-7-p.m. policy,[14] but it seems to be a matter of private concern to TRM, with no impact on the applications for Medicare reimbursement filed by TRM's clients.

Although Ms. Morgan-Lee's reporting on regulatory deficiencies and violations of TRM rules cannot be considered protected activity, *Karvelas*, 360 F.3d at 237, she also focused significant attention on billing issues, which do implicate concerns about potential FCA violations.  Her emails with Ms. Rajagopal express concerns about TRM's billing practices, and her emails with Mr. St. Jacques point to specific instances in which billing practices might reasonably be expected to lead to inaccurate or misleading reimbursement claims.  These specific instances also support the inference that Ms. Morgan-Lee's later, less-detailed communications with Mr. Scott and with TRM's owners were aimed at raising concerns about improper billing practices that could ultimately contribute to FCA violations.

---

[14] It appears that work done outside of TRM's ordinary workday may have obligated the company to pay overtime rates.  One of Ms. Morgan-Lee's notations also implies that she was concerned about patients being too fatigued to receive treatment if therapists treated them at odd hours.  [*See* Ex. 33 ("Deb, OTR, still in building very late at night, one patient missed Rx 'due to fatigue' Sat pm (she was there til 1030pm)[.]")].

The fact that Ms. Morgan-Lee's first call to a TRM owner (Mr. Pontolilo) sparked him to request a comprehensive review by ownership of TRM's billing and documentation practices, reinforces Ms. Morgan-Lee's contention that the issues she was raising went beyond mere regulatory or internal company policy concerns.  Importantly, the fact that Ms. Morgan-Lee went outside of her typical reporting structure and communicated directly with TRM's owners demonstrates that she exceeded her assigned duties and thus engaged in protected conduct, even under the heightened standard applicable to employees whose regular duties include overseeing government billing or detecting fraud.  I note, however, that the evidence before me does not show that Mr. Pontolilo knew or believed at that time that the issues raised to him by Ms. Morgan-Lee, however serious, involved fraud.

To be subject to the anti-retaliation protections of the FCA, an employee need not expressly invoke the FCA.  All that is required is that the substance of the employee's investigation or reporting must be foreseeably linked to potential false or fraudulent submissions to the government.  *Cf. Yesudian*, 153 F.3d at 741 ("The protected conduct itself is simply 'acts done . . . in furtherance of an action under this section,' and even an investigation conducted without contemplation of — or knowledge of the legal possibility of — a False Claims Act suit

59

can end up being 'in furtherance' of such an action."
(alteration in original) (quoting 31 U.S.C. § 3730(h))).

The fact that many of Ms. Morgan-Lee's reports are poorly
organized and mix protected topics with unprotected ones is
relevant in drawing inferences about the reasons that she was
fired.  But the evidence is clear that some of Ms. Morgan-Lee's
communications addressed potential false claims for payment
within the meaning of the FCA, and that some of her
communications clearly went outside of her usual duties.
Accordingly, I find and conclude she has shown by a
preponderance of the evidence that she engaged in protected
activity.

   2.   Employer Knowledge

        a.   *Legal Standard*

To prove that an employer had knowledge of an employee's
protected activity, the employee need only show that the
employer had "general corporate knowledge" of the activity.  *See*
*Gordon v. N.Y.C. Bd. of Educ.*, 232 F.3d 111, 116 (2d Cir. 2000)
("Neither this nor any other circuit has ever held that, to
satisfy the knowledge requirement, anything more is necessary
than general corporate knowledge that the plaintiff has engaged
in a protected activity."); *see also Harrington* v. *Aggregate*
*Indus. Ne. Region, Inc.*, 668 F.3d 25, 32 (1st Cir. 2012)
(holding, in the context of a motion for summary judgment, that

"the fact that high-level [. . .] executives learned of the appellant's whistleblowing several months before his firing suffices to show knowledge").

There is no requirement that the employer recognize that the employee might bring an FCA action or even that the employer know of the FCA.  Rather, it is adequate for a plaintiff employee to show that the employer knew that the employee was engaged in "investigation or other activity concerning false or fraudulent claims that the employer knowingly presented to the federal government."[15]  *Karvelas*, 360 F.3d at 239.

The First Circuit has recognized that the standard for establishing employer knowledge that an employee was engaged in protected activity is different "where an employee's job responsibilities involve overseeing government billings or payments."  *Maturi* v. *McLaughlin Rsch. Corp.*, 413 F.3d 166, 173 (1st Cir. 2005).  When an employee has such responsibilities, the employee's "burden of proving that [her] employer was on notice that [she] was engaged in protected conduct should be

---

[15] Although TRM did not submit claims directly to the government, it was well-understood throughout the organization that its billings would ultimately become part of Medicare reimbursement requests.  A submission to the government need not be direct to establish liability for a false claim under the FCA.  *See Guilfoile*, 913 F.3d at 187 ("A 'non-submitting' entity that knowingly causes the submission of a false claim may be liable under the FCA even if the entity directly submitting the claim to the government lacks the requisite mental state.").

heightened." *Id.*  The employee "must make it clear that [her] actions go beyond [her] regular duties to establish that [her] employer was on notice that [she] was engaged in protected conduct." *Id.* at 172-73.

For employees, like Ms. Morgan-Lee, with auditing or fraud-reporting responsibilities, "such an employee can put [her] employer on notice by 'any action which [. . .] would put the employer on notice that [FCA] litigation is a reasonable possibility.'" *Id.* at 173 (final alteration in original) (quoting *Eberhardt v. Integrated Design & Const., Inc.*, 167 F.3d 861, 868 (4th Cir. 1999)).  "Employees subject to the heightened burden 'must make clear their intentions of bringing or assisting in an FCA action in order to overcome the presumption that they are merely acting in accordance with their employment obligations.'" *Id.* (quoting *U.S. ex rel. Ramseyer v. Century Healthcare Corp.*, 90 F.3d 1514, 1523 n.7 (10th Cir. 1996)).

> b.   *Analysis*

There is no question that TRM knew about Ms. Morgan-Lee's efforts to identify and remedy billing failures at TRM and that TRM knew such billing failures could lead to the submission of false or fraudulent claims for Medicare reimbursement.  Such awareness, however, is not necessarily the same thing as knowing that Ms. Morgan-Lee was engaged in protected activity.  After all, Ms. Morgan-Lee's ordinary job responsibilities included

conducting audits and reporting potential fraud.  This is the
very reason for the heightened standard required under the First
Circuit's *Maturi* decision.

That routine duties of auditors include detecting and
reporting fraud does not turn every auditor into an FCA
whistleblower.  Auditors are not afforded greater protections
from adverse employment actions than other at-will employees
merely because their ordinary duties may include reporting about
matters that are subject to the FCA.

In deciding whether Ms. Morgan-Lee's actions gave TRM
notice of the possibility of FCA litigation and thus met the
heightened standard of *Maturi*, I give substantial weight to her
specific references to whistleblower protections as such.
Although it is not clear whether she or TRM knew precisely which
statutory protections she was invoking, knowledge of the FCA is
not required for whistleblower protection.  *Karvelas*, 360 F.3d
at 238 ("[J]ust as the plaintiff is not required to know that
his investigation reasonably could lead specifically to a False
Claims Act action, the employer need not know that the employee
has filed or plans to file a qui tam action, nor even
necessarily be aware of the existence of the FCA.").

Ms. Morgan-Lee's references to whistleblower protections in
her emails to Mr. Scott gave the company general corporate
knowledge that she was engaging in something beyond her ordinary

duties as an internal auditor and that she was considering

bringing or assisting in a suit alleging FCA violations.  *See*

*Maturi*, 413 F.3d at 173.

Accordingly, even under the heightened burden associated

with her position as an employee with audit responsibilities, I

find and conclude that Ms. Morgan-Lee has shown by a

preponderance of the evidence that she provided TRM with general

corporate knowledge of her protected activity.  Although her

audit responsibilities were a part of her regular job, her

references to fraud and whistleblower protections were

sufficient to put TRM on notice that she was engaged in

protected activity beyond the scope of her typical duties.

The chronology of these communications is significant.  Ms.

Morgan-Lee's earliest references to "whistle blowing" date to

the beginning of November 2011,[16] *after* Mr. Scott and Ms.

Rajagopal had already begun conferring about how to respond to

---

[16] As noted above, in an email dated November 10, 2011, Ms.
Morgan-Lee asserted to Mr. Scott that, "I absolutely informed
you on the phone on Friday November 4, 2011 that my concerns
were along the lines of 'retaliation of internal whistle
blowing' and I informed you that I felt being unfairly treated
due to me informing Uma of certain findings." [Ex. 28].  By
this account, November 4, 2011, would be Ms. Morgan-Lee's
earliest reference to "whistle blowing."  I do not find Ms.
Morgan-Lee's reconstruction of the November 4, 2011, telephone
conversation fully credible.  In the final analysis, this does
not change my ultimate finding that she provided TRM with
general corporate knowledge of her protected activity before the
allegedly retaliatory action took place.

Ms. Morgan-Lee's repeated absences.  [*See* Ex. 40 (email chain beginning November 1, 2011)].  Indeed, Ms. Morgan-Lee acknowledged in her trial testimony that she had not even used the term "fraud" in her communications with Mr. Scott as of October 28, 2011, but had referred only to "improper billing." [*See* Dkt. No. 349 p. 76].  As discussed below, this timing strongly undercuts any inference that the problem of her unexpected absences was raised as a pretext or that Ms. Morgan-Lee was discharged "because of" her protected activity.

3.   Retaliatory Causation

a.   *Legal Standard*

Under 31 U.S.C. § 3730(h), an employee is entitled to relief if she was discharged "because of" her lawful actions taken in furtherance of an FCA suit or other efforts to stop an FCA violation.  31 U.S.C. § 3730(h).  This language imposes a but-for standard of causation in FCA retaliation cases.  *See Lestage v. Coloplast Corp.*, 982 F.3d 37, 46 (1st Cir. 2020) ("[R]etaliation claims under the False Claims act must be evaluated under the but-for causation standard.").

Ms. Morgan-Lee can prevail on her retaliation claim only if she can demonstrate that, but for her FCA-protected activity, she would have kept her job.

b.   *Analysis*

As discussed above, I have found that some portion of Ms.
Morgan-Lee's reporting concerned allegations of billing
irregularities that would fall within the ambit of the FCA.  I
have found, further, that her communications – though poorly
organized – were sufficient to put her employer on notice that
she considered the issues to be serious to a degree that
exceeded her ordinary job duties.  Thus, the evidence is
sufficient to make out the first two elements of a retaliation
claim.

The question, then, is whether Ms. Morgan-Lee would have
been retained at TRM but for her protected conduct.  I find and
conclude that the answer is no.

While some of Ms. Morgan-Lee's communications rose to the
level of protected activity, the evidence does not persuade me
that it was her protected activity that led to her firing.
Considering the record of contemporaneous emails and weighing
the witnesses' testimony, what stands out is that other factors
— factors that readily warranted discipline or discharge — were
far more critical than any suggestion of protected activity.

There are, undoubtedly, cases in which even a modest
showing of protected activity may support an inference of
retaliation, particularly when the timing is suspicious and when
there are no other explanatory factors.  But this is not such a

case.  Ms. Morgan-Lee had been raising concerns about billing practices for many months – she says years – before there was any hint of disciplinary concerns.  On the contrary, her supervisor, Ms. Rajagopal, went to some lengths to *retain* Ms. Morgan-Lee as an employee and to support Ms. Morgan-Lee's efforts to improve TRM's practices and procedures.  Even if Ms. Rajagopal's support may have been intermittent or may have fallen short of what Ms. Morgan-Lee expected, the evidence does not show that Ms. Rajagopal had any intention to fire — or otherwise retaliate against — Ms. Morgan-Lee in a manner actionable under the FCA.

Friction between Ms. Morgan-Lee and Ms. Rajagopal was escalated to become an "HR" matter only after Ms. Morgan-Lee repeatedly missed work on minimal notice.  Even then, TRM officials explored whether some form of extended leave or accommodation might be appropriate.  Thereafter, Ms. Morgan-Lee effectively ensured her discharge by refusing to engage with Mr. Scott and by refusing to give details of her claimed findings of impropriety.  An employer would not be required to retain an employee who responded in that manner; it is, after all, an auditor's job to report her findings.

The evidence demonstrated that there were several key factors that led to Ms. Morgan-Lee's discharge, none of which implicate protected activity.  I find that she was fired for

these reasons, not in retaliation "because of" her investigation
or reporting of any potential violations of the FCA.  I rehearse
that evidence below.

Testimony and exhibits showed that Ms. Morgan-Lee was
highly dedicated to her work and cared very much that the
company follow its own policies and the law.  The record also
shows, however, that she behaved towards her colleagues and
superiors in a way that TRM management could reasonably have
viewed as unproductive and disruptive.  She sent long emails to
colleagues at all hours of day and night; she repeatedly
insulted the capabilities of her coworkers while insisting that
the culture of speaking ill of coworkers was making her sick
with stress; she repeatedly responded to only parts of work
emails, ignoring questions asked of her; and she often failed to
differentiate real fraud concerns from generalized gripes about
corporate operations or interpersonal issues.  All these
challenges impeded Ms. Morgan-Lee's efforts to convey her
findings.

I am not called upon in this case to determine who is
ultimately "at fault" in the deterioration of the working
relationship between Ms. Morgan-Lee and her colleagues at TRM.
Ms. Morgan-Lee's own written communications are frequently
jumbled, but some of Ms. Rajagopal's are difficult to follow as
well.  Furthermore, there is scant basis on which to reliably

reconstruct the oral conversations between Ms. Morgan-Lee and her colleagues.

Ms. Morgan-Lee was adamant in her testimony that she was subjected to retaliatory harassment.  Based on evidence discussed above, however, I find that her perceptions were frequently distorted.  Key discrepancies in the evidence suggest that some of Ms. Morgan-Lee's testimony about interactions with her colleagues is unreliable.  The most notable discrepancies are in Ms. Morgan-Lee's account of the meeting on October 28, an account that was directly contradicted by Mr. Scott's credible testimony.  Ms. Morgan-Lee described a profane tirade in which Ms. Rajagopal purportedly threatened anyone with "the F-ing balls to report fraud." [*See* Dkt. No. 349 p. 75].  It is difficult to square Ms. Morgan-Lee's account with her acknowledgement that she did not even use the word "fraud" when speaking to Mr. Scott about the meeting later the same day. [*See id.* at 76].  Moreover, given the large number of people present at the meeting, the absence of corroborating testimony is glaring.

In a similar vein, Ms. Morgan-Lee contended that her purpose in October and November was to report fraud committed or condoned by Ms. Rajagopal.  This is difficult to square with her contemporaneous email requesting that Ms. Rajagopal attend the November 14 meeting with Mr. Scott.  [*See* Ex. 47].

Even if Ms. Rajagopal and other senior personnel from TRM were inept in their management of Ms. Morgan-Lee, the evidence does not show that they were animated by retaliatory motives. I find by a preponderance of the evidence that the communications and interactions that Ms. Morgan-Lee saw as personal attacks and harassment were attempts – whether skillful or not – to manage the company. While the tone of some interactions was fraught, Ms. Morgan-Lee has not shown that TRM or its managers set out to harass her, let alone that their intentions were retaliatory.

Ms. Morgan-Lee's behavior before October 27, 2011, would itself have provided a valid, nonretaliatory reason to fire her, and it doubtless contributed to her eventual termination. The evidence shows, however, that the issue that ultimately motivated TMR to dismiss Ms. Morgan-Lee was a combination of her repeated unexcused absences from work in the weeks preceding her firing and her unwillingness to provide TRM with details of the fraud that she claimed to have found.

As for Ms. Morgan-Lee's absences, the communications to her from Mr. Scott and from TRM's attorneys made clear that her unexcused right to absences were a significant issue. Mr. Scott spelled out explicitly that TRM needed a Director of Clinical Services who would be reliably available to discharge the duties of the position, and that she could not remain in the position if she continued to take unannounced leave. Her unexcused

70

absences were unquestionably a fireable offense, and I find and conclude that they were a central cause of her dismissal.

Ms. Morgan-Lee's first invocation of "whistleblower" protections, on November 4, at the earliest, would have put her employer on notice that her fraud claims went beyond her ordinary reporting responsibilities. But that came only *after* her unscheduled absences had been identified as a serious problem.

Ms. Morgan-Lee's unwillingness to provide details necessary for TRM to investigate her claims, came roughly at the same time as she asserted her status as a "whistleblower." In any event, Mr. Scott credibly testified that Ms. Morgan-Lee refused to provide him with any specific examples of the fraudulent conduct to which she continually referred. In her own testimony, and in contemporaneous emails, Ms. Morgan-Lee acknowledged as much. She was a senior employee tasked with auditing records and detecting billing issues. It was her job to report significant findings in that arena. It was unquestionably a dereliction of her duties to spend weeks asserting that she had found fraud and then refuse to provide details to company executives and company counsel. Her refusal to cooperate with TRM management in this primary facet of her duties was, too, a fireable offense that was central to her dismissal.

I note that Ms. Rajagopal and the owners of TRM appeared to care about billing properly and that they went to significant lengths to continue working with Ms. Morgan-Lee, even though she was challenging as a colleague.  Ms. Rajagopal sent several emails to her team admonishing them that they needed to put more effort into billing correctly, and representatives of the company, including one of the owners, spent considerable time speaking with Ms. Morgan-Lee to seek details about the fraudulent practices that she claimed to have uncovered.  None of the correspondence in evidence suggests that management at TRM sought to oust Ms. Morgan-Lee to prevent her from raising her concerns, or to punish her for raising them.

The testimony and the contemporaneous correspondence that was offered in evidence reflect a near-total breakdown in the relationship between Ms. Morgan-Lee and her peers and supervisors.  Firing a worker because of a breakdown in the employment relationship is legitimate and nonretaliatory. *Johnson* v. *Allyn & Bacon, Inc.*, 731 F.2d 64, 73 (1st Cir. 1984) ("[A]n inability to get along with people is a legitimate non-discriminatory reason for firing an employee."); *see also Ridge* v. *Cape Elizabeth Sch. Dep't*, 77 F. Supp. 2d 149, 158 (D. Me. 1999) (employee's "inability to work productively with her supervisor" was a legitimate, nondiscriminatory reason for termination).

Ms. Morgan-Lee's contemporaneous emails also reflect her own assessment that she was too stressed to do her job effectively.  This, too, is a legitimate, nonretaliatory reason for firing her.  *Candelore* v. *Clark Cty. Sanitation Dep't*, 975 F.2d 588, 591 (9th Cir. 1992) (per curiam) (legitimate, nondiscriminatory reason for transferring work responsibilities to another employee was that plaintiff "was suffering from job related stress").

One can imagine circumstances in which an employer's efforts to squelch protected FCA activity could take the form of a long-term campaign of harassment, producing stress that diminishes an employee's performance and results in her firing.[17] The evidence in this case, however, does not support any such finding.  The communications that Ms. Morgan-Lee decried as "undermining" her efforts were fully consistent with a good-faith effort to acknowledge and implement an auditor's recommendations, while simultaneously attempting to maintain an appropriate separation of authority between the company's operational and auditing functions.

I have considered the scope of the written evidence, the plausibility and consistency of the witnesses' testimony, and the demeanor of the testifying witnesses.  I find and conclude

---

[17] If such a campaign of harassment were to cause an employee to quit, it would be a constructive dismissal.

that Ms. Morgan-Lee has not sustained her burden of proving by a preponderance of evidence that she was subjected to adverse employment action as retaliation for her protected FCA activity, whether in the initial period of heightened friction (from Spring of 2011 forward) or in the period from the end of October through her dismissal in early December of 2011.

In sum, TRM had multiple legitimate, nonretaliatory reasons to fire Ms. Morgan-Lee, and it is more likely than not that one, or some combination, of those reasons was the cause of her termination.  In light of all the evidence developed over the course of two trials, I find that Ms. Morgan-Lee has not shown by a preponderance of the evidence that her protected activity was a but-for cause of her termination.

### B.   RIWPA Retaliation

Ms. Morgan-Lee also alleges that TRM violated the Rhode Island Whistleblowers' Protection Act (RIWPA), R.I. Gen. Laws §§ 28-50-1 to -9.  In relevant part, the RIWPA provides as follows:

> An employer shall not discharge [. . .] an employee [. . .] [b]ecause the employee reports verbally or in writing to the employer or to the employee's supervisor a violation, which the employee knows or reasonably believes has occurred or is about to occur, of a law or regulation or rule promulgate under the laws of this state [. . .] or the United States [. . .].

28 R.I. Gen. Laws Ann. § 28-50-3.  There has been little litigation of the RIWPA, and there is no binding decision as to what causation standard the RIWPA applies.  One federal case

explains that the statute requires a "'substantial nexus' between the protected report of a violation by the employee and the adverse employment action, which must be based on more 'than pure speculation.'"  *Chagnon* v. *Lifespan Corp.*, No. CV 15-493S, 2017 WL 3278952, at *7 (D.R.I. June 19, 2017) (quoting *Belanger v. A & F Plating Co.*, No. Civ. A. 98-2339, 2002 WL 1288782, at 4 (R.I. Super. Ct. June 7, 2002)).

Despite this somewhat unusual turn of phrase — more than pure speculation — appearing in a few cases, it appears that courts generally interpret the RIWPA using the same frameworks that apply to the interpretation of the FCA.  In deciding motions for summary judgment, courts interpreting the RIWPA apply the familiar burden-shifting framework from *McDonnell Douglas Corp.* v. *Green*, 411 U.S. 792, 802-05 (1973), that applies to FCA summary judgment determinations.  *See Harrington*, 668 F.3d at 31 (adopting the *McDonnell Douglas* framework for FCA cases in the First Circuit); *Chagnon* at *7 (applying the *McDonnell Douglas* framework); *Chapman v. R.I. Veterans' Home*, No. 01-4767, 2001 WL 36410316, at *3 (R.I. Super. Ct. Sept. 19, 2012) (same).  Rhode Island courts typically then apply a but-for standard of causation, explicitly or implicitly.  *See, e.g.*, *Chapman*, 2001 WL 36410316, at *7 ("In other words, the jury had to determine whether Plaintiff, despite all of her alleged

mistakes and missteps, would not have been subject to discipline and termination 'but for' her reporting activity.").

I am persuaded that, as a matter of Rhode Island law, the use of the term "because" in the RIWPA means essentially the same thing as the term "because of" in the FCA. Accordingly, Ms. Morgan-Lee's retaliation claim under the RIWPA must fail in light of my conclusion that Ms. Morgan-Lee has not proven that her protected FCA whistleblowing activity was a but-for cause of her discharge from TRM. Accordingly, Ms. Morgan-Lee has not proven by a preponderance of the evidence that she was terminated in violation of the RIWPA.

## V. JUDGMENT

For the reasons set forth above, I find that Ms. Morgan-Lee has not shown by a preponderance of the evidence that she was terminated from her position at TRM because of activity protected by the FCA or by the RIWPA. Accordingly, I direct judgment for defendant TRM.


*/s/ Douglas P. Woodlock*
DOUGLAS P. WOODLOCK
United States District Judge